FROST ET AL., RESPONDENTS, *v.* LONG & CO. ET AL., APPELLANTS.

(No. 5,404.)

(Submitted April 21, 1924. Decided July 7, 1924.)

[228 Pac. 75.]

*Conversion — Livestock — Mortgage Foreclosure — Evidence— Admissions — Instructions—Special Damages — Failure to Plead—Improper Admission of Evidence.*

Conversion—Livestock—Mortgage Foreclosure—Evidence as to How Deficiency Paid Immaterial and Incompetent.

1. In an action for the conversion of the major portion of a herd of mortgaged cattle, defendant claiming that the animals had trespassed upon his lands, and that he had seized and sold them upon refusal of plaintiff to pay for their pasturing, it was prejudicial error to permit plaintiff, after testifying that subsequent to their seizure and sale the mortgage on them had been foreclosed and the notes secured thereby paid, to testify further that, the proceeds of the foreclosure proving insufficient to satisfy the mortgage the mortgagee had recourse to property of plaintiff's comaker of the notes, his father, such evidence having been both immaterial and incompetent, with a tendency to prejudice the jury against the defendant.

Same—Failure to Plead Special Damages—Inadmissibility of Evidence.
2. In the absence of any claim of special damages arising from an alleged conversion of livestock, admission of testimony that but for the conversion the mortgage on them would not have been foreclosed and that prior to their conversion plaintiff had made preparation for their wintering, was prejudicial error, the effect of its admission having been to inflame the minds of the jury against defendant.

Same—Good Faith of Plaintiff in Buying Livestock in Suit and Selling to Coplaintiff—Intent—Evidence—Admissibility.
3. Where the good faith of plaintiff in buying a herd of cattle and paying no money therefor but giving his note and a mortgage on them, and in subsequently selling them to his coplaintiff, an

Indian, who paid for them in like manner, was called in question in their action for the conversion of the cattle, he was properly permitted to testify as to his intent in buying and in making certain arrangements with his coplaintiff with regard to them.

Evidence as to Matter Stricken from Answer—Proper Exclusion.
4. Questions asked as to matters stricken from the answer and therefore no longer in issue were properly excluded.

Same—Foreclosure After Conversion—Returns from Sales of Cattle—Proper Question on Cross-examination.
5. Where only a portion of a herd of cattle alleged to have been converted by defendant was accounted for by sales made by the defendant and the sheriff on foreclosure sale, a question on cross-examination whether the mortgagee had received returns from other sales of the mortgaged cattle not included in the number converted was properly permitted to be answered.

Instructions—Issue Raised by Pleadings—Improper Refusal.
6. Refusal of an offered instruction on an issue raised by the pleadings was error.

Conversion—Livestock—Animals not Taken—Liability of Defendant—Improper Refusal of Instruction.
7. *Held*, that where a shortage of mortgaged cattle at the time of foreclosure of the mortgage after an alleged conversion was proven, refusal of an instruction offered by defendant (to the effect that if defendant after selling a certain number admitted to have been sold, did not interfere with those remaining, he could not be held liable for their loss occasioned by other causes), in the absence of which the jury may have charged defendant with the value of animals not taken by defendant, was error.

Instructions—What may be Properly Refused.
8. Refusal of an instruction the subject of which was covered by other paragraphs of the charge, or of one argumentative in form, or of one not warranted by the evidence, is proper.

Conversion—Livestock—Evidence—When Admission not Conclusive.
9. Where the evidence in an action for the conversion of a herd of cattle showed that defendant at no time had possession of more than 117 head, a letter written by defendant's foreman to plaintiff that he was holding approximately 200 head for payment of pasturage charges was not a conclusive admission of a conversion of the latter number.

Same—Livestock—Gathering in Roundup does not Constitute Conversion.
10. Since at a roundup of cattle it is necessary that all animals in a given territory be gathered, those not desired to be carried farther being turned back on the range, the mere inclusion of a certain number of plaintiff's cattle in the roundup did not constitute conversion of, or render the defendant who conducted the roundup liable for, that number.

New Trial—Appeal from Order Denying, Abolished.
11. The right to appeal from an order denying a new trial was abolished by section 9745, Revised Codes of 1921, and therefore an attempted appeal from such an order will be dismissed.

*Appeal from District Court, Yellowstone County; Robert C. Stong, Judge.*

ACTION by D. L. Frost and another against J. B. Long & Co., Inc., and others. Judgment for plaintiffs, and defendants appeal from the judgment and from an order denying new trial. Appeal from order denying new trial dismissed and judgment reversed, and cause remanded for a new trial, with directions to dismiss the action as to defendant Frank Heinrich.

*Messrs. Cooper, Stephenson & Hoover* and *Messrs. Nichols & Wilson,* for Appellants, submitted a brief; *Mr. Edmund Nichols* argued the cause orally.

*Messrs. Grimstad & Brown, Messrs. Goddard & Clark* and *Messrs. Gunn, Rasch & Hall,* for Respondents, submitted a a brief; *Mr. O. K. Grimstad* argued the cause orally.

HONORABLE JOHN C. HUNTOON, District Judge, sitting in place of MR. JUSTICE GALEN, disqualified, delivered the opinion of the court.

This is an appeal from a judgment given and made in favor of the plaintiffs and against the defendants Frank Heinrich, J. B. Long & Co., a copartnership, R. F. Clary, executor of the estate of J. B. Long, and R. F. Clary individually, for $17,545.30, and interest thereon at the rate of eight per cent per annum from the twentieth day of July, 1919, amounting to $22,812.76, at the date of the judgment, April 23, 1923, and also for exemplary damages in the sum of $10,000 against the defendants J. B. Long & Co., a copartnership, R. F. Clary, as executor of the estate of J. B. Long, and R. F. Clary individually, and for costs of the action, and an attempt is made to appeal from the order denying the defendants' motion for a new trial.

The record discloses the following facts: On or about the tenth day of May, 1919, the plaintiff Tompkins purchased from Price-Moffett Company 206 head of cattle for the sum of $24,620.50, giving no money therefor, but executing a chattel

mortgage on the cattle and other personal property owned by him to the company to secure the full purchase price evidenced by a note due October 10, 1919, and bearing eight per cent interest per annum. This mortgage was subsequently assigned by Price-Moffett Company to the Portland Cattle Loan Company. Ten days subsequent thereto the plaintiff Tompkins sold to the plaintiff Frost 200 head of cattle, reserving six head out of the number purchased by him, but of what sex is not shown by the record, and the price for which that sale was made was $28,500. No money passed from the plaintiff Frost to the plaintiff Tompkins on the sale, but a note was given by Frost to Tompkins in the sum named, due one year from date, and bearing eight per cent per annum and ten per cent after maturity; the note being secured by chattel mortgage on the cattle bought by Frost.

The cattle purchased by Tompkins consisted of 106 head of steers, bought at the agreed price of $125 each, and ninety-seven head of cows, bought at the agreed price of $90 each, and three bulls at $150 or $200. The plaintiff Tompkins had a ranch leased from one Cooper at the time he bought these cattle, and the plaintiff Frost, an unmarried man, who is a Crow Indian, had an unfenced allotment within the limits of what was known as lease No. 4 on the Crow Reservation. Under the rules and regulations governing this lease and the use of the reservation for grazing, each head of a family, or single Indian, male or female over eighteen years of age could graze 100 head of stock on the reservation free of charge, provided that the stock belonged to such person, and was branded with the I D brand on the right hip, and provided that such person lived on the reservation. The plaintiff Frost was entitled under this rule to graze 100 head of stock, and claimed that he had seen a circular from the Interior Department allowing each Indian, male or female, over eighteen years of age, to run over 100 head upon paying the range fee, which circular he says he saw in the spring of 1919, after Long & Co. had the lease on the reservation. The plaintiff Frost was a

ditch rider in the employ of the government at the time of the purchase of the cattle and continued to carry out his duties as such ditch rider during all of the time mentioned in the pleadings in this case.

Lease No. 4 on the Crow Indian Reservation, which consisted of several thousand acres of land, was held prior to 1917 by the defendant F. M. Heinrich, but in that year the defendant J. B. Long & Co. acquired the lease and purchased a large number of cattle then running on the leased land from Heinrich. In 1919 the plaintiff Tompkins placed 100 head of cattle upon the lease, for which he paid no rental, and was told by Long & Co. that he could no longer run cattle on that lease.

At the time of the sale by Tompkins to Frost, in addition to the chattel mortgage executed by Frost to Tompkins, they entered into a written agreement with each other in which Tompkins agreed to look after the cattle, and Frost agreed to pay him for his services one-half of the net profits accruing over and above the purchase price of the cattle, evidenced by the note given by Frost to Tompkins, and at the same time Frost executed a power of attorney to Tompkins, authorizing him to brand the increase and buy, sell, dispose of and in every way trade in, manage and control all of the cattle; it being the intention of both Tompkins and Frost to engage in the cattle business. The cattle were subsequently turned out upon lease No. 4 and ranged with cattle owned by Long & Co. and Heinrich. Tompkins remained in control of the cattle sold to Frost and rode the range in looking after them.

In July, 1919, the range having become burned up and, in the judgment of the defendant Clary and others, insufficient to support the cattle then running upon the lease, a roundup was begun earlier than usual for the purpose of shipping a large portion of the cattle to market, and part of the Tompkins-Frost cattle were rounded up by the defendants with the cattle owned and controlled by Long & Co. and Heinrich. The Long & Co. cattle were looked after by the defendant Clary, who was the manager for the company, and the defendant

71 Mont.—10

Heinrich was looking after his own cattle and was with the roundup for the purpose of making delivery to Long & Co. of the balance of cattle theretofore sold by him to them. The plaintiff Tompkins frequently saw Clary after he (Clary) spoke about taking the cattle off the range, but had not seen him for eighteen or twenty days prior to the receipt of a letter from Clary, dated the twentieth day of July, received by Tompkins about the 21st. This letter reads as follows:

"July 20, 1919.

"Mr. B. A. Tompkins, Billings, Montana—

"Dear Sir: You are hereby notified that we have gathered and are now holding on our lease on the Crow Indian Reservation in Montana, approximately 200 head of your cattle which have been unlawfully trespassing on our lease since early last May. We are holding these cattle under statutory lien for $1,500 for pasturage, feed, care and handling for approximately two and a half months.

"We will ship our own cattle to Chicago, on the 25th of this month, and, unless the above charges are paid and your cattle permanently removed from our lease before that date, we shall ship them with our own, have our charges, damages and expenses deducted, and the proceeds of their sale remitted to the Montana Stock Association for transmittal to the owner, mortgagee, or other persons entitled to the same.

"The particular cattle to which this notice refers are covered by a mortgage from yourself to Price-Moffett Company, which mortgage has been assigned to Portland Cattle & Loan Company. We have wired the Portland Cattle & Loan Company substantially what is stated herein, and are giving Price-Moffett Company a similar notice.

"J. B. LONG & CO.,
"R. F. CLARY."

In answer to this letter Tompkins sent a letter to Nichols & Wilson, the attorneys for J. B. Long & Co., and R. F. Clary, dated July 22, 1919, and referring to the fact that the letter handed to him by Mr. Clary, and above quoted, was written

on the stationery of Nichols & Wilson, signed Grimstad & Brown, the attorneys for Tompkins and Frost. Therein Tompkins advised the defendants that the cattle referred to in the letter received from them were the absolute property of Frost (the plaintiff), and the letter also stated that Grimstad & Brown represented Mr. Frost in the matter, and advised the defendants J. B. Long & Co. and R. F. Clary that he (Frost) did not desire the cattle belonging to him shipped at that time because of their unfitness for market, notifying them that if J. B. Long & Co. and Clary persisted in gathering and disposing of the cattle as indicated by the letter, he (Frost) would look to them for compensation for damages done thereby, and disclaimed any liability for pasturage, feed, caring and handling of the cattle, claiming that they were on the reservation under the rules and regulations of the Indian Department. It appears further that subsequently, and before the cattle were shipped, Frost offered to pay to the defendant Clary any reasonable sum for pasturage of all cattle in excess of 100 head owned by him (Frost), which offer was refused. This letter was in turn answered by Nichols & Wilson, attorneys for the defendants, and the answer shows that there was considerable feeling in connection with the matter, on the part of the defendant Clary at least.

It appears that Frost and Tompkins were present during part of the roundup, but claimed they offered no help or assistance in handling any of the cattle, which were handled and controlled by the defendant R. F. Clary; the defendant Heinrich, however, was only looking after his own cattle and giving advice as to the general running of the roundup, which was in charge of an employee of J. B. Long & Co., one Thomas.

Nowhere in the testimony is it shown how many head of the cattle owned by Frost and formerly bought by Tompkins were included in the roundup, but it does appear that at a place called Miffin there were cut out of the roundup and turned back on the range twenty-one head of cows and calves belonging to Frost, and at another point eight head of cows, heavy with

calf, were cut out and turned back. This testimony is given by the defendant Clary and defendants' witness Thomas and is not disputed; and it is admitted that eighty-eight head of the Frost cattle, fifty-seven head of steers and thirty-one head of cows were shipped by the defendants J. B. Long & Co. and R. F. Clary, to Omaha, Nebraska, and there sold by the Mutual Live Stock Company for the net sum of $4,708.15. The brands on these cattle are given in the account sales, and it is admitted they were part of the cattle bought by Tompkins and included in the transaction between Tompkins and Frost. This money was sent by the Mutual Live Stock Commission Company to the secretary of the Montana Live Stock Commission, and after retaining therefrom $7 for each of the eighty-eight head, the net proceeds so received by the commission were forwarded to the Portland Loan Company at the request of the Price-Moffett Company, who were their agents. Subsequently the $7 per head so held out was remitted to the Price-Moffett Company in Billings for the Portland Cattle Loan Company. Thereafter, in November, 1919, the Portland Cattle Loan Company foreclosed the chattel mortgage against the plaintiff Tompkins and took all of the cattle found upon the range covered by the mortgage, sixty-six head in all, and the price received therefor and credited to Tompkins on the note amounted to $3,300. The amounts so received not being sufficient to fully discharge the obligation of Tompkins to the Portland Cattle Loan Company under its mortgage, recourse was then had to the property of the father of the plaintiff Tompkins, who had signed the note with his son, and the full amount due was paid to the Portland Cattle Loan Company before the institution of this action. This testimony was admitted over the objections of defendants.

There is a very marked dispute in the testimony given with reference to the value of the cattle in July, 1919, some witnesses testifying that the cattle were worth at least as much as Tompkins had agreed to pay for them, and others claiming that, there being no local market at that time, they were worth

[71 Mont. 141.]

only what they would bring upon the eastern market after deducting cost of transportation. The plaintiffs brought this action in conversion for the alleged value of the full 200 head of cattle and increase, and interest thereon from July 20, 1919, the date of the letter written by the defendant Clary and referred to heretofore.

No exceptions were taken to the charge of the court as given. [1] Assignment of error No. 1 is based upon the admission of testimony as to how the note and mortgage given to Price-Moffett Company was paid. Objection to the introduction of this evidence upon the ground of immateriality was made, overruled and the witness permitted to testify that the proceeds of the sale of eighty-eight head by the defendants were applied and also the amount received by sale under foreclosure, and, that not being sufficient to satisfy the debt, recourse was had to the property of A. C. Tompkins, the father of the plaintiff B. A. Tompkins, the note having been signed also by the elder Tompkins.

We cannot see where this evidence was material under the issues. Evidence had already been given by the plaintiff Tompkins, without objection, that the notes secured by the mortgage had been paid before the institution of this action, in June, 1921. This was to prove the allegation of the complaint to that effect, and was admissible for that purpose and to show that plaintiffs had the right to sue and not the mortgagee; but we can see no reason for further pursuing the inquiry as to how they were paid. Testimony as to recourse being had against the property of the elder Tompkins was immaterial and incompetent. The result of such testimony must have been to prejudice the jury against the defendants, and probably accounts, in part at least, for the large amount allowed as exemplary damages. The admission of this testimony constituted prejudicial error in any view of the case.

Assignments 4 and 7, and one of the questions assigned as [2] error No. 2, were to the action of the court in overruling the defendants' objections as to whether or not the mortgage

would have been foreclosed by the mortgagees, were it not for the shipping of some of the cattle by the defendants, and also as to preparations of the plaintiffs for the wintering and care of the cattle. Objections were made to all of them upon the ground of immateriality and irrelevancy, overruled and the plaintiff Tompkins and the witness Moffett permitted to answer at length. We think prejudicial error was committed by these rulings, as no special damage was alleged. No claim was made for loss occasioned by getting ready for the caring of these cattle in the winter, and nowhere in the evidence does it appear that the plaintiffs suffered any damage by reason of any contracts made in that respect, or by reason of any money expended. The effect of such evidence was to inflame the minds of the jurors against the defendants.

Error No. 4 is assigned to question asked of plaintiff **[3]** Tompkins as to his intent in buying the cattle and in making his arrangements with Frost with regard to them. We think he had a right to show this as indicative of his good faith in his transaction with Frost, which was challenged by the defense, and no error was committed in allowing this testimony to be given.

No error was committed in sustaining the objections assigned **[4]** as errors 5 and 6. This matter had already been stricken from the answer, and was not at the time of the trial an issue.

Error No. 7 is assigned to questions asked of John K. Moffett of the Price-Moffett Company, to which company the mortgage was originally made, and who acted as agent of the Portland Cattle Loan Company, assignee of the mortgage, if they would have foreclosed if defendants had not taken possession of the cattle and shipped a portion of them. Both of these questions, assigned as errors 2 and 7, were objected to as immaterial; No. 3 upon the ground of incompetency. We think prejudicial error was committed in overruling all of these objections, as no special damages were alleged. The latter question, in addition to being incompetent, was further objectionable as assum-

ing that the defendants had taken possession of all of the cattle.

The questions asked, set forth in assignment No. 9, so far as [5] they concern the question whether the mortgagees had received returns from other sales of the mortgaged cattle remaining on the reservation, we think should have been answered. It was both material and proper cross-examination. The figures given from the account sales and from the sheriff's return on foreclosure show only 154 head of these cattle accounted for. What became of the remaining forty-six head and increase is not shown. It was certainly a legitimate subject of inquiry to discover if any returns from the missing cattle had been received by the mortgagee. Moffett had already testified that credit had been given for eighty-eight head sold by defendants and the proceeds of the foreclosure.

We think the court's refusal to give defendants' offered [6] instruction No. 8 was error. That issue was raised by the pleadings and should have been submitted to the jury by this instruction.

We think the court erred in refusing to give defendants' [7] offered instruction No. 11. The defendants were entitled to this, in view of the fact that there was proven a shortage in number when the foreclosure was made, and to refuse it would permit the jury to charge the defendants with the value of cattle which they might never have seen or in any manner moved or taken possession of in any way. For the same reasons defendants' offered instruction No. 12 should have been given.

The court committed no error in refusing defendants' [8] offered instructions Nos. 13 and 14. The jury was fully instructed on the law of conversion. No. 14 is objectionable as argumentative. The court committed no error in refusing to give defendants' offered instruction No. 17. It was not warranted by the evidence given. The court committed no error in refusing defendants' offered instructions Nos. 22 and

25.  No. 22 was not warranted under the evidence, and No. 26 was given in substance in the court's instructions.

The defendants' offered instruction No. 31, specification No. 39, is objectionable.  Down to the word "unknown" it is unobjectionable.  The remainder of the proposed instruction is bad.  If the jury had been told that they might take those facts into consideration in determining the number of head converted by the defendants, we think such an instruction would have been proper.  As it was framed, however, we think the court committed no error in refusing it.  We think it was proved beyond question that at no time did the defendants have in their possession to exceed 117 head of the cattle in question.  Of these, twenty-nine were turned back on their range when cut back.

The plaintiff's whole theory was based upon the admissions of the defendants J. B. Long & Co. and Clary, contained in the letter of July 20, 1919, stating that they had gathered and were holding approximately 200 head of the cattle in question.  It was shown, however, by all the testimony, that no witnesses, either for plaintiffs or defendants, had any knowledge of there being to exceed 117 head of the cattle in question in the roundup.  We cannot agree with the plaintiffs that this letter, in the face of the evidence, constitutes conclusive proof that defendants converted 200 head.  We think the assertion, foolishly made, has been entirely disproved by the evidence given.  As to what number was actually converted by any of the defendants the jury had the right to determine.  Plaintiffs seemed to consider that, because a certain number of head were gathered in the roundup, that fact then and there constituted a conversion of that number, even if some of them were cut out and left on their range; and this irrespective of the intent in gathering them into the roundup.  We cannot agree with plaintiffs as to this theory, in view of the evidence and the custom in handling range cattle, known to everyone in this state.  It is necessary to gather all cattle in a given territory, and then to cut back or turn out of the roundup those

not desired to be carried further. The record is full of this proof in this case, by all the witnesses testifying to the method of procedure at a roundup, and to hold otherwise would render those engaged in conducting a roundup liable to the owners of all outside cattle, gathered, cut back and left on their range.

On the other hand, the defendants' theory was and most of their proposed instructions were based upon the theory that in no event were they liable for any number of head in excess of eighty-eight actually shipped and sold by them. This theory is untenable, in view of the fact that there was shown a shortage of forty-six head when the eighty-eight head and sixty-six head sold under foreclosure were taken into consideration, and no proof as to whether that sixty-six head included the twenty-nine head which at one time were actually in the possession of J. B. Long & Co. and Clary, and turned back. The jury, under proper instructions, were the sole judges of the number actually converted.

It was not shown by the evidence received that the defendant Heinrich was in any way involved in the conversion of any cattle. He was there only by reason of the fact that he had sold some of the cattle running on lease No. 4 to J. B. Long & Co., and had not at that time delivered the full number. He was there to deliver and brand those cattle with the tally bar, and thus constitute a full delivery, or at least to the extent of those gathered in the roundup. He had no objection to the Tompkins-Frost cattle being on the range, and no interest in the claim of Long & Co. for pasturage. He bore no ill will or malice against the plaintiffs, and was not in charge of the roundup; an employee of Long & Co. and the defendant Clary being actually in charge. He profited in no way from the sale of the eighty-eight head. For these reasons the evidence is insufficient to sustain any judgment against the defendant Heinrich.

An attempt was made to appeal from the order denying a [11] new trial. This cannot be done, as the right to appeal from such an order has been abolished. (Sec. 9745, Rev. Codes

1921.) For that reason the attempted appeal from the order denying defendants' motion for a new trial is hereby dismissed.

For the errors pointed out, the judgment is reversed and the cause remanded for a new trial, with directions to the lower court to dismiss the action as to the defendant Frank Heinrich.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY and COOPER and HONORABLE WM. L. FORD, District Judge, sitting in place of MR. JUSTICE STARK, disqualified, concur.